**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION**

**LITTLE ROCK FAMILY PLANNING
SERVICES,** *et al.*                                              **PLAINTIFFS**

**v.**                                   **Case No. 4:21-cv-00453-KGB**

**LARRY JEGLEY, in his official capacity
as Prosecuting Attorney of Pulaski
County,** *et al.*                                              **DEFENDANTS**

<u>**PRELIMINARY INJUNCTION**</u>

Before the Court is a motion for temporary restraining order and/or preliminary injunction filed by plaintiffs Little Rock Family Planning Services ("LRFP"), Planned Parenthood of Arkansas & Eastern Oklahoma, d/b/a Planned Parenthood Great Plains ("PPAEO"), and Janet Cathey, M.D., on behalf of themselves, their staff, and their patients (Dkt. No. 12).  Plaintiffs bring this action seeking declaratory and injunctive relief on behalf of themselves and their patients under the United States Constitution to challenge an Act passed by the Arkansas General Assembly.  Act 309 of 2021 ("Act" or "Act 309") provides, in pertinent part, that "[a] person shall not purposely perform or attempt to perform an abortion except to save the life of a pregnant woman in a medical emergency."  Act 309 § 5-61-404(a).  This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(3).

For the reasons set forth below, the Court grants plaintiffs' motion for a preliminary injunction (Dkt. No. 12).

    **I.    Procedural Background**

On May 26, 2021, plaintiffs filed their verified complaint for declaratory and injunctive relief alleging that Act 309 unconstitutionally bans nearly all abortions in Arkansas (Dkt. No. 1).  Plaintiffs attached to their complaint the declarations of Lori Williams, clinical director of LRFP;

Brandon Hill, president & chief executive officer of PPAEO; and Dr. Cathey affirming that the statements contained in the complaint are true and correct to the best of the declarant's knowledge and belief (*Id.*, at 19–21).  Defendants are public officials of the State of Arkansas charged with enforcing criminal laws and medical licensing penalties, including the Prosecuting Attorney for Pulaski County, members of the Arkansas State Medical Board, the Secretary of the Arkansas Department of Health, and members of the Arkansas State Board of Health (*Id.*, ¶¶ 17–19). Plaintiffs sue defendants in their official capacities (*Id.*, ¶ 19).  Defendants filed their answer to plaintiffs' complaint on June 16, 2021 (Dkt. No. 14).  The parties agree that the Act will become effective on July 28, 2021 (Dkt. No. 1, ¶ 9; Dkt. No. 14, ¶ 9).

On June 14, 2021, plaintiffs filed the instant motion seeking to enjoin enforcement of the Act prior to July 28, 2021 (Dkt. No. 12, at 1).  On June 21, 2021, the Court set a briefing schedule and noticed a hearing for July 8, 2021, if the parties requested a hearing or if the Court determined that a hearing on the motion would benefit the Court (Dkt. No. 16).  The parties informed the Court *via* electronic mail that they would not request a hearing.  The Court concluded that a hearing would not benefit the Court and removed the hearing on the motion from the calendar for July 8, 2021 (Dkt. No. 23, at 1).  On June 28, 2021, defendants filed a response in opposition to plaintiffs' motion, and on July 6, 2021, plaintiffs filed a reply in further support of their motion (Dkt. Nos. 22, 24).

## II.    Findings Of Fact

The Court makes the following findings of fact.  In making the following findings of fact, the Court considers the entire record before it, including plaintiffs' verified complaint and sworn declarations attached thereto (Dkt. No. 1), the text of Act 309, and the parties' briefing before the Court.  All findings of fact contained herein that are more appropriately considered conclusions of

law are to be so deemed.  Likewise, any conclusions of law more appropriately considered findings

of fact shall be so classified.  The Court has considered and weighed all the evidence presented at

this stage of the proceedings; the Court has resolved any disputes consistent with the statements in

this Order.

1.      LRFP is a professional limited liability corporation that is licensed to do business

in Arkansas (Dkt. No. 1, ¶ 14).  LRFP provides abortion services and reproductive healthcare

services in Little Rock, Arkansas (*Id.*).  Plaintiff PPAEO is an Oklahoma not-for-profit corporation

licensed to do business in Arkansas (*Id.*, ¶ 15).  PPAEO operates a health center in Little Rock,

Arkansas, and provides abortion services and reproductive healthcare services (*Id.*).  Dr. Cathey is

a board-certified obstetrician-gynecologist ("OBGYN"), licensed to practice medicine in Arkansas

and Oklahoma (*Id.*, ¶ 16).  She provides full-time medical services, including abortion, at PPAEO's

health center in Little Rock and provides occasional support to LRFP (*Id.*).

2.      LRFP and PPAEO operate the only outpatient clinics currently providing abortions

in the state of Arkansas (*Id.*, ¶ 27).

3.      Defendant Larry Jegley is the prosecuting attorney for Pulaski County, Arkansas

(*Id.*, ¶ 17).  Prosecuting attorneys "shall commence and prosecute all criminal actions in which the

state or any county in his district may be concerned."  Ark. Code Ann. § 16-21-103.  Mr. Jegley is

therefore responsible for criminal enforcement of the Act in Pulaski County (Dkt. No. 1, ¶ 17).

Plaintiffs' health centers are located in Pulaski County, Arkansas (*Id.*).

4.      Defendant Sylvia D. Simon, M.D., is Chairman of the Arkansas State Medical

Board (*Id.*, ¶ 18).  Defendants Robert Breving Jr., M.D; Veryl D. Hodges, D.O.; John H. Scribner,

M.D.; Elizabeth Anderson; Rhys L. Branman, M.D.; Edward Gardner, M.D.; Rodney Griffin,

M.D.; Betty Guhman; Brian T. Hyatt, M.D.; Timothy C. Paden, M.D.; Don R. Phillips, M.D.;

William L. Rutledge, M.D.; and David L. Staggs, M.D., are members of the Arkansas State Medical Board (*Id.*). The State Medical Board is responsible for licensing medical professionals under Arkansas law. *See* Ark. Code Ann. §§ 17-95-403, 409, 410. The State Medical Board and its members are responsible for imposing licensing penalties for unprofessional conduct, which includes, among other things, the "[c]onviction of a felony" and "[p]rocuring or aiding or abetting in procuring a wrongful and criminal abortion." *See* Ark. Code Ann. § l7-95-409(a)(2)(A), (D).

5.      Defendant Jose R. Romero, M.D., is the Secretary of the Arkansas Department of Health (Dkt. No. 1, ¶ 19). Defendants Phillip Gilmore, Ph.D., M.S., M.H.A.; J. Loy Bailey; Perry Amerine, O.D.; Marsha Boss, P.D.; Lane Crider, P.E.; Brad Emey, D.M.D., P.L.C.; Melissa Faulkenberry, D.C.; Anthony N. Hui, M.D.; Balan Nair, M.D.; Greg Bledsoe, M.D.; Stephanie Barnes Beerman; Glen Bryant, M.D.; Dwayne Daniels, M.D.; Darren Flamik, M.D.; David Kiessling, D.P.M.; Carl Riddell, M.D.; Clay Waliski; Terry Yamauchi, M.D.; Donald Ragland; Susan Weinstein, D.V.M.; and James Zini, D.O., are members of the Arkansas State Board of Health (*Id.*). The Department of Health's members are charged with enforcing licensing penalties, including license denial, suspension, or revocation, for violation of any provision of law or rule, including the Act. *See* Ark. Code Ann. § 20-9-302(b)(3)(A).

6.      Act 309 states that "[i]t is the intent of this subchapter to ensure that abortion in Arkansas is abolished *and to protect* the lives of unborn children." Act 309 § 5-61-402(b) (emphasis in original). The Act further states that "[t]he General Assembly finds that . . . [t]he State of Arkansas urgently pleads with the United States Supreme Court to do the right thing, as they did in one of their greatest cases, Brown v. Board of Education, which overturned a fifty-eight-year-old precedent of the United States, and reverse, cancel, overturn, and annul Roe v. Wade, Doe v. Bolton, and Planned Parenthood v. Casey." *Id.* § 5-61-402(a)(l2).

4

7.      The Act provides that "[a] person shall not purposely perform or attempt to perform an abortion except to save the life of a pregnant woman in a medical emergency."  Act 309 § 5-61-404(a).

8.      The Act defines "medical emergency" to mean "a condition in which an abortion is necessary to preserve the life of a pregnant woman whose life is endangered by a physical disorder, physical illness, or physical injury, including a life-endangering physical condition caused by or arising from the pregnancy itself."  Act 309 § 5-61-403(3).

9.      The Act excludes from the definition of "abortion" acts performed that may result in the termination of a pregnancy where the purpose is to "to save the life or preserve the health of the unborn child," "remove a dead unborn child caused by spontaneous abortion," or "remove an ectopic pregnancy."  Act 309 § 5-61-403(1)(B).  The Act defines "unborn child" as "an individual organism of the species Homo sapiens from fertilization until live birth."  *Id.* § 5-61-403(4).

10.     Performance or attempted performance of an abortion in violation of the Act constitutes an unclassified felony, which is punishable by up to ten years in prison or a fine of up to $100,000.  Act 309 § 5-61-404(b).

11.     Any physician who performs or attempts to perform an abortion in violation of the Act may also be subject to medical license revocation, suspension, probation, and/or fines or other disciplinary action.  *See* Ark. Code Ann. §§ 17-95-409(a), 410(e)(3).

12.     An abortion clinic wherein an abortion is performed or attempted to be performed in violation of the Act may also be subject to license denial, suspension, or revocation, or financial penalties.  *See* Ark. Code Ann.§§ 20-9-302(b)(3)(A), 20-7-101(b)(l)(A).

13.     The Act is currently scheduled to take effect on July 28, 2021 (Dkt. No. 1, ¶ 26 (citing Ark. Att'y Gen. Op. No. 2021-029 (May 20, 2021))).

14.     Legal abortion is one of the safest medical procedures in the United States and is far safer than continuing a pregnancy through to childbirth (Dkt. No. 1, ¶ 28).  A person's risk of death associated with childbirth is approximately 14 times higher than that associated with abortion (*Id.* (citing Elizabeth G. Raymond & David A. Grimes, *The Comparative Safety of Legal Induced Abortion and Childbirth in the United States*, 119 Obstetrics & Gynecology 215, 215 (2012))).

15.     Approximately one in four women in this country will have an abortion by age 45 (*Id.*, ¶ 29 (citing *Abortion Is a Common Experience for U.S. Women, Despite Dramatic Declines in Rates*, Guttmacher Inst. (Oct. 19, 2017), https://www.guttmacher.org/news-release/2017/abortion-common-experience-us-women-despite-dramatic-declines-rates)).

16.     In 2019, approximately 65% of women who obtained abortion in Arkansas had one or more previous live births (*Id.*, ¶ 31 (citing Ark. Ctr. of Health Stat., Ark. Dep't of Health, *Induced Abortion Report 2019*, at 12 (2020), https://www.healthy.arkansas.gov/images/uploads/pdf/Induced_Abortion_final_2019-closed.pdf [hereinafter *Induced Abortion Report 2019*])).

17.     Being forced to continue a pregnancy against one's will can pose a risk to a person's physical, mental, and emotional health, and even their life, as well as to the stability and well-being of their family, including existing children (*Id.*, ¶ 48).

18.     Even for someone who is otherwise healthy and has an uncomplicated pregnancy, being forced to carry that pregnancy to term and give birth poses serious medical risks and can have both short and long-term consequences on physical health and mental and emotional well-being (*Id.*, ¶ 48).  For someone with a medical condition caused or exacerbated by pregnancy, these risks are increased (*Id.*).

19.     Between 2013 and 2017, Arkansas's maternal mortality rate was 50% higher than the maternal mortality rate for the nation overall (*Id.*, ¶ 50 (citing Ark. Dep't of Health, *Arkansas Maternal Mortality Review Committee Legislative Report*, at 8 (Dec. 2020), https://www.healthy.arkansas.gov/images/uploads/pdf/FINAL_MMRC_Legislative_Report_12.09.20_PDF.pdf [hereinafter *Maternal Mortality*])).

20.     In some cases of miscarriage, the process of pregnancy loss itself ends embryonic or fetal cardiac activity (*Id.*, ¶ 52).  In those cases, Act 309 would allow the patient to access medical care to empty the uterus.  *See* Act 309 § 5-61-403(1)(A)-(B).

21.     In other cases of miscarriage, cardiac activity persists while the patient is actively miscarrying (Dkt. No. 1, ¶ 53).  In those cases, the standard of care is also to offer the patient medical treatment to empty the uterus (*Id.*).  However, the Act would prohibit physicians from providing such care unless and until the patient's condition deteriorates to such an extent that the very narrow "medical emergency" exception is triggered (*Id.*).  This would pose serious risk to the physical, mental, and emotional health of these patients (*Id.*).

22.     In 2019, Black people made up just over 15% of Arkansas's population, but more than 46% of people who obtained abortions in Arkansas were Black (*Id.*, ¶ 55 (citing *QuickFacts: Arkansas, Population Estimates*, U.S. Census Bureau (July 1, 2019), https://www.census.gov/quickfacts/AR; *Induced Abortion Report* at 4)).  Black women die of maternal mortality at almost two times the rate of white women (*Id.* (citing *Maternal Mortality* at 8)).

23.     Arkansas is the fifth poorest state in the nation, with a poverty rate of 16.2% (*Id.*, ¶ 56 (citing *2019 Poverty Rate in the United States*, U.S. Census Bureau (Sept. 17, 2020), https://www.census.gov/library/visualizations/interactive/2019-poverty-rate.html)).

24.     Approximately 27.1% of Black Arkansans live below the poverty line, as compared to approximately 13.6% of their white counterparts (*Id.*, ¶ 57 (citing *Arkansas Poverty Status in the Past 12 Months*, U.S. Census Bureau (2019), https://data.census.gov/cedsci/table?q=Arkansas%20poverty&tid=ACSST1Y2019.S1701)).

25.     The majority of plaintiffs' patients are poor or low-income (*Id.*, ¶ 58).

26.     Higher poverty rates have been shown to be associated with higher maternal mortality risks among both white and Black women (*Id.*, ¶ 59 (citing Gopal K. Singh, *Maternal Mortality in the United States, 1935-2007: Substantial Racial/Ethnic, Socioeconomic, and Geographic Disparities Persist*, U.S. Dep't of Health & Human Servs. (2010), http://www.hrsa.gov/ourstories/mchb75th/mchb75maternalmortality.pdf)).

27.     According to 2019 population estimates, 41% of Arkansans live in rural counties (*Id.*, ¶ 60 (citing Univ. of Ark. Div. of Agric., *Rural Profile of Arkansas*, at 7 (2021), https://www.uaex.edu/publications/pdf/MP564.pdf [hereinafter *Rural Profile of Arkansas*])).

28.     Rural counties in Arkansas have higher poverty rates than urban counties and also have less direct access to healthcare resources than their urban counterparts (*Id.*, ¶ 61 (citing *Rural Profile of Arkansas* at 27; *Rural Health Programs*, Ark. Dep't of Health, https://www.healthy.arkansas.gov/programs-services/topics/rural-health-programs; *About Rural Health*, Centers for Disease Control & Prevention, https://www.cdc.gov/ruralhealth/about.html (last updated Aug. 2, 2017))).

29.     According to the Arkansas Department of Health, 74 of Arkansas's 75 counties have been designated partially or fully medically underserved areas (*Id.*, ¶ 62 (citing Naomi Sweeney, *Arkansas Medically Underserved Areas (MUA)*, Ark. Dep't of Health (Aug. 21, 2020),

https://www.healthy.arkansas.gov/images/uploads/pdf/Medically_Underserved_Area_Map_2020
.pdf;).

30.     According to the U.S. Centers for Disease Control and Prevention, in 2015, rural

areas had a pregnancy-related mortality ratio of 29.4 per 100,000 live births as compared to 18.2

in urban areas (*Id.*, ¶ 63 (citing Dina Fine Maron, *Maternal Health Care Is Disappearing in Rural*

*America*,          Scientific          American          (Feb.          15,          2017),

https://www.scientificamerican.com/article/maternal-health-care-is-disappearing-in-rural-

america/; Centers for Medicare & Medicaid Servs., *Improving Access to Maternal Health Care in*

*Rural     Communities*,     at     4     (2019),     https://www.cms.gov/About-CMS/Agency-

Information/OMH/equity-initiatives/rural-health/09032019-Maternal-Health-Care-in-Rural-

Communities.pdf; National Advisory Comm. on Rural Health & Human Servs., U.S. Dep't of

Health & Human Servs., *Maternal and Obstetric Care Challenges in Rural America* (May 2020),

https://www.hrsa.gov/sites/default/files/hrsa/advisory-committees/rural/publications/2020-

maternal-obstetric-care-challenges.pdf)).

## III.     Conclusions of Law

When determining whether to grant a motion for a preliminary injunction, this Court

considers:  (1) the movant's likelihood of success on the merits; (2) the threat of irreparable harm

to the movant; (3) the balance between the harm to the movant and the injury that granting an

injunction would cause other interested parties; and (4) the public interest.  *Kroupa v. Nielsen*, 731

F.3d 813, 818 (8th Cir. 2013) (quoting *Dataphase Sys. Inc. v. CL Sys.*, 640 F.2d 109, 113 (8th Cir.

1981)).  Preliminary injunctive relief is an extraordinary remedy, and the party seeking such relief

bears the burden of establishing the four *Dataphase* factors.  *Watkins Inc. v. Lewis*, 346 F.3d 841,

844 (8th Cir. 2003).  The focus is on "whether the balance of the equities so favors the movant that

justice requires the court to intervene to preserve the *status quo* until the merits are determined." *Id*. "Although no single factor is determinative when balancing the equities," a lack of irreparable harm is sufficient ground for denying a preliminary injunction. *Aswegan v. Henry*, 981 F.2d 313, 314 (8th Cir. 1992).

The Court examines the *Dataphase* factors as applied to plaintiffs' request for a preliminary injunction. *See Dataphase*, 640 F.2d at 113. Under *Dataphase*, no one factor is determinative. *Id*. The Eighth Circuit revised the *Dataphase* test when applied to challenges to laws passed through the democratic process. Those laws are entitled to a "higher degree of deference." *Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 725, 732 (8th Cir. 2008). In such cases, it is never sufficient for the moving party to establish that there is a "fair chance" of success. Instead, the appropriate standard, and threshold showing that must be made by the movant, is "likely to prevail on the merits." *Id.* Only if the movant has demonstrated that it is likely to prevail on the merits should the Court consider the remaining factors. *Id.*

A.    Standing

To establish standing under Article III of the U.S. Constitution, a plaintiff must show "(1) injury in fact, (2) a causal connection between that injury and the challenged conduct, and (3) the likelihood that a favorable decision by the court will redress the alleged injury." *Young Am. Corp. v. Affiliated Computer Servs., Inc.*, 424 F.3d 840, 843 (8th Cir. 2005) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)). Plaintiffs must have a "sufficiently concrete interest in the outcome of [the] suit to make it a case or controversy." *Sec'y of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 955 n.5 (1984) (alteration in original) (quoting *Singleton v. Wulff*, 428 U.S. 106, 112 (1976)).

The United States Supreme Court held in *Doe v. Bolton*, 410 U.S. 179, 188 (1973), that abortion doctors have first-party standing to challenge laws limiting abortion when, as in *Doe* and the current case, the doctors are subject to penalties for violation of the laws.  *See Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833, 903-04, 909 (1992) (plurality opinion); *Planned Parenthood of Central Missouri v. Danforth*, 428 U.S. 52, 62 (1976); *Nyberg v. City of Virginia*, 495 F.2d 1342, 1344 (8th Cir. 1974) (stating that *Doe* is not limited to affording standing to a physician only when threatened with criminal prosecution); *Planned Parenthood of Wis., Inc. v. Schimel*, 806 F.3d 908, 911 (7th Cir. 2015); *Planned Parenthood of Greater Tex. Surg. Health Serv. v. Abbott II*, 748 F.3d 583, 598 (5th Cir. 2014); *Planned Parenthood of Wis., Inc. v. Van Hollen*, 738 F.3d 786, 794 (7th Cir. 2013).  Standing can also derive from a different, lesser injury, such as a potential financial impact on a physician from an abortion restriction.  *See Singleton*, 428 U.S. at 112-13 (finding that physicians "suffer[ed] concrete injury from the operation of the challenged statute" which prevented them from receiving Medicaid reimbursements if certain requirements about the nature of the procedure were not met).

Here, the Act puts physicians at risk of criminal penalties.  The Act provides that "[p]erforming or attempting to perform an abortion is an unclassified felony with a fine not to exceed one hundred thousand dollars ($100,000) or imprisonment not to exceed ten (10) years, or both." Act 309 § 5-61-404(b).  Thus, physicians face a potential injury or sanction if they do not comply with the Act.  *See Doe*, 410 U.S. at 188; *June Med. Servs. v. Russo*, 140 S. Ct. 2103, 2119 (2020) (plurality opinion) (stating that the "threatened imposition of governmental sanctions" for noncompliance eliminates any risk that their claims are abstract or hypothetical).

The Court declines to accept defendants' argument that the Supreme Court's decision in *Kowalski v. Tesmer*, 543 U.S. 125 (2004), controls this case.  The Court previously addressed a

similar argument in *Hopkins v. Jegley*, Case No. 4:17-cv-00404-KGB, 2021 WL 41927, at \*49 (E.D. Ark. Jan. 5, 2021).  Generally, a plaintiff may assert the constitutional rights of a third party if the plaintiff has a "close relationship" to the third party and if there exists some "hindrance to the third party's ability to protect his or her own interests."  *Powers v. Ohio*, 499 U.S. 400, 411 (1991); *see Kowalski*, 543 U.S. at 130.  Here, the third parties are the patients who are purportedly harmed by the challenged Act that inhibits their right to abortion.

Further, the Supreme Court has recognized categorically that abortion and reproductive health care providers and physicians have third-party standing to assert the rights of their patients. *Singleton*, 428 U.S. at 118; *see also, e.g.*, *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292 (2016) (adjudicating physicians' and clinics' 42 U.S.C. § 1983 action against abortion restrictions on behalf of themselves and their patients); *Gonzales v. Carhart*, 550 U.S. 124, 133 (2007); *Stenberg v. Carhart*, 530 U.S. 914, 922 (2000); *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 845 (1992).  Other courts when confronted with this argument have rejected it.  *See, e.g.*, *Abbott II*, 748 F.3d at 589 n.9.

Defendants further argue that "at a minimum, Plaintiffs lack standing to pursue any claim—let alone preliminary relief—with respect to post-viability abortions because they do not claim to perform such abortions." (Dkt. No. 22, at 14).  Plaintiffs reply that, because Arkansas already prohibits abortion after 22 weeks from the woman's last menstrual period ("LMP") and post-viability abortions, "a preliminary injunction as to pre-viability abortions is appropriate to preserve the *status quo* and to prevent irreparable harm." (Dkt. No. 24, at 2 n.2).

Accordingly, the Court concludes that, at this point in the proceedings, plaintiffs have standing to challenge the Act with respect to pre-viability abortions.

### B.    Facial Challenge

Plaintiffs' constitutional challenge to the Acts may be deemed a "facial" or "as-applied" challenge.  Facial challenges to statutes affecting abortions may succeed only if a plaintiff can show that "in a large fraction of the cases in which [the law] is relevant, it will operate as a substantial obstacle to a woman's choice to undergo an abortion."  *Casey*, 505 U.S. at 895 (majority opinion); *see Hellerstedt*, 136 S. Ct. at 2318 (striking down an admitting privileges requirement because the law "provides few, if any, health benefits for women" and "poses a substantial obstacle to women seeking abortions"); *Planned Parenthood of Ark. & E. Okla. v. Jegley*, 864 F.3d 953, 959 (8th Cir. 2017) ("[I]n order to sustain a facial challenge and grant a preliminary injunction, the district court was required to make a finding that the Act's contract-physician requirement is an undue burden for a large fraction of women seeking medication abortions in Arkansas."); *id*. at 960 n.9 ("The question here . . . is whether the contract-physician requirement's benefits are substantially outweighed by the burdens it imposes on a large fraction of women seeking medication abortion in Arkansas."); *see also Planned Parenthood Minn., N.D., S.D. v. Rounds*, 653 F.3d 662, 667-68 (8th Cir. 2011), *vacated in part on reh'g en banc*, 662 F.3d 1072 (8th Cir. 2011) and *vacated in part on reh'g en banc*, 686 F.3d 889 (8th Cir. 2012); *Rounds*, 530 F.3d at 733 n.8.  In *Gonzales*, the Supreme Court stated that, while the plaintiffs had failed to satisfy the "large fraction" test under *Casey* and were not entitled to facial relief, the challenged law would be open "to a proper as-applied challenge in a discrete case."  550 U.S. at 168.

Having recognized this distinction in the types of challenges that may be brought, the Court also notes that the distinction between facial and as-applied challenges is not always apparent.  *See Hellerstedt*, 136 S. Ct. at 2307 ("Nothing prevents this Court from awarding facial relief as the appropriate remedy for petitioners' as-applied claims."); *see also* Richard R. Fallon, Jr., *Fact and*

*Fiction about Facial Challenges*, 99 Cal. L. Rev. 915, 922 (2011).  For the reasons set forth below, at this stage of the proceeding and on the record evidence before it, the Court concludes that plaintiffs are entitled to facial relief against the Act.

### C.    Governing Law

Federal constitutional protection of reproductive rights is based on the liberty interest derived from the due process clause of the Fourteenth Amendment.  *Casey*, 505 U.S. at 846 (majority opinion).  "[I]t is a constitutional liberty of the woman to have some freedom to terminate her pregnancy."  *Id.* at 869.  This right is grounded in the right to privacy rooted in the Fourteenth Amendment's concept of personal liberty, which was found to be "broad enough to encompass a woman's decision whether or not to terminate her pregnancy."  *Roe v. Wade*, 410 U.S. 113, 153 (1973).  This right is not "unqualified" and is balanced "against important state interests in regulation," eventually drawing a line between a woman's privacy right and the State's interest in protecting the potential life of a fetus at viability.  *Roe*, 410 U.S. at 154.  Part of *Roe*'s essential holding is "a recognition of the right of the woman to choose to terminate a pregnancy before viability and to obtain it without undue interference from the State.  Before viability, the State's interests are not strong enough to support a prohibition of abortion or the imposition of a substantial obstacle to the woman's effective right to elect the procedure."  *Casey*, 505 U.S. at 846.  "A State may not prohibit any woman from making the ultimate decision to terminate her pregnancy before viability."  *Id.* at 879.

The Supreme Court in *Gonzales* acknowledged that:

[T]he State, from the inception of the pregnancy, maintains its own regulatory interest in protecting the life of the fetus that may become a child, [and this premise] cannot be set at naught by interpreting *Casey's* requirement of a health exception so it becomes tantamount to allowing a doctor to choose the abortion method he or she might prefer.  Where it has a rational basis to act, and it does not impose an undue burden, the State may use its regulatory power to bar certain procedures and

> substitute others, all in furtherance of its legitimate interests in regulating the
> medical profession in order to promote respect for life, including life of the unborn.

550 U.S. at 158.  The Court acknowledges that the state may, in a valid exercise of its police power,

regulate abortion.  The state's police power is, however, limited where a protected liberty interest

is at stake.  *Casey*, 505 U.S. at 851.  "The State's interest in regulating abortion previability is

considerably weaker than postviability."  *Stenberg v. Carhart*, 530 U.S. 914, 930 (2000) (citing

*Casey*, 505 U.S. at 870).

In *Hellerstedt*, the Supreme Court observed that viability is the "relevant point at which a

State may begin limiting women's access to abortion for reasons unrelated to maternal health."

136 S. Ct. at 2320 (quoting *Casey*, 505 U.S. at 878 (plurality opinion)); *see also June Med. Servs.*,

140 S. Ct. at 2133 (plurality opinion) (concluding that Louisiana law was unconstitutional because

it was nearly identical to law held unconstitutional in *Hellerstedt*); *id.* at 2142 (Roberts, C.J.,

concurring in the judgment) (same).  The Court acknowledges that the state can impose regulations

aimed at ensuring a thoughtful and informed choice, but only if such regulations do not unduly

burden the right to choose.  *Casey*, 505 U.S. at 872.

The Eighth Circuit Court of Appeals has previously examined arguments and record

evidence related to viability and the State's ability to restrict abortion before viability.  *See Little

Rock Family Planning Servs. v. Rutledge*, 984 F.3d 682, 688–90 (8th Cir. 2021); *Edwards v. Beck*,

786 F.3d 1113, 1119 (8th Cir. 2015) (per curiam); *MKB Management Corp. v. Stenehjem*, 795 F.3d

768 (8th Cir. 2015).  The court explained that prohibitions on abortions pre-viability, even when

they contain limited exceptions, are *per se* unconstitutional under binding Supreme Court

precedent.  *Rutledge*, 984 F.3d at 687; *Edwards*, 786 F.3d at 1117; *MKB Mgmt.*, 795 F.3d at 771.

In *Edwards*, the court invalidated a prior Arkansas law that prohibited nearly all abortions starting

at 12 weeks LMP, explaining that "a State may not prohibit any woman from making the ultimate

decision to terminate her pregnancy before viability." *Edwards*, 786 F.3d at 1117 (quoting *Casey*, 505 U.S. at 879).

In *MKB Management*, the court assumed the principles of *Casey*, as the Supreme Court did in *Gonzales*. *MKB Mgmt.*, 795 F.3d at 772 (citing *Gonzales*, 550 U.S. at 146; *Casey*, 505 U.S. at 879, 878, and 877 (plurality opinion)). Further, the court acknowledged that, just as the court is bound by the Supreme Court's assumption of the principles announced in *Casey*, the court is also bound by the Supreme Court's "statement that viability is the time 'when, in the judgment of the attending physician on the particular facts of the case before him, there is a reasonable likelihood of the fetus' sustained survival outside the womb, with or without artificial support.'" *MKB Mgmt.*, 795 F.3d at 772-73 (quoting and citing *Colautti v. Franklin*, 439 U.S. 379, 388 (1979)); *see also Casey*, 505 U.S. at 870 (plurality opinion) ("[T]he concept of viability . . . is the time at which there is a realistic possibility of maintaining and nourishing a life outside the womb[.]"); *Roe*, 410 U.S. at 160, 163 (stating that a fetus becomes viable when it is "potentially able to live outside the mother's womb, albeit with artificial aid" and that viability is the point at which the fetus "presumably has the capability of meaningful life outside the mother's womb").

### D.   Analysis Of *Dataphase* Factors

The Court turns to examine the factors set forth in *Dataphase* as applied to plaintiffs' current request for a preliminary injunction. 640 F.2d at 113. In deciding a preliminary injunction motion, the Court considers four factors: (1) the probability that the movant will succeed on the merits; (2) the threat of irreparable harm to the movant; (3) the balance of the equities; and (4) the public interest. *Grasso Enterprises, LLC v. Express Scripts, Inc.*, 809 F.3d 1033, 1035 n.2 (8th Cir. 2016) (citing *Dataphase*, 640 F.2d at 114). Under *Dataphase*, no one factor is determinative. *Id.* at 113.

The Eighth Circuit modifies the *Dataphase* test when applied to challenges to laws passed through the democratic process.  Those laws are entitled to a "higher degree of deference." *Rounds*, 530 F.3d at 732.  In such cases, it is never sufficient for the moving party to establish that there is a "fair chance" of success.  Instead, the appropriate standard, and threshold showing that must be made by the movant, is "likely to prevail on the merits."  *Id.*  Only if the movant has demonstrated that it is likely to prevail on the merits should the Court consider the remaining factors.  *Id.*

## 1.    Likelihood Of Success On The Merits

As explained above, bans on pre-viability abortions are categorically unconstitutional. *Casey*, 505 U.S. at 879 ("Regardless of whether exceptions are made for particular circumstances, a State may not prohibit any woman from making the ultimate decision to terminate her pregnancy before viability."); *Rutledge*, 984 F.3d at 687 ("The Supreme Court has repeatedly stated that its pre-viability rule is categorical[.]").  This principle "has been accepted as controlling by a majority of the [Supreme] Court."  *Edwards*, 786 F.3d at 1117 (internal quotations omitted) (citing *Gonzales*, 550 U.S. at 156).  The Eighth Circuit has thus concluded that an Arkansas act which banned abortions after 12 weeks' gestation prohibited women from making the ultimate decision to terminate a pregnancy at a point before viability.  *Id.*; *see also MKB Mgmt.*, 795 F.3d at 773 ("Because there is no genuine dispute that H.B. 1456 generally prohibits abortions before viability—as the Supreme Court has defined that concept—and because we are bound by Supreme Court precedent holding that states may not prohibit pre-viability abortions, we must affirm the district court's grant of summary judgment to the plaintiffs.").

Here, the Act is a pre-viability abortion ban.  The Act provides that "[a] person shall not purposely perform or attempt to perform an abortion except to save the life of a pregnant woman

in a medical emergency." Act 309 § 5-61-404(a).  The Act thus "prohibit[s] any woman from making the ultimate decision to terminate her pregnancy before viability." *Casey*, 505 U.S. at 879. Defendants do not make any argument to the contrary and concede that plaintiffs are likely to succeed on the merits (Dkt. No. 22, at 9).  Instead, defendants argue that *Roe* and *Casey* were wrongly decided and that there is no constitutional right to abortion (*Id.*, at 14–20).  As a federal district court, this Court "is *bound* by the Supreme Court's decisions in *Casey*." *Edwards*, 786 F.3d at 1117 (emphasis in original).  Accordingly, the Act is categorically unconstitutional, and plaintiffs have demonstrated that they are likely to succeed on the merits.

### 2.      Irreparable Harm

A plaintiff seeking a preliminary injunction must establish that the claimant is "likely to suffer irreparable harm in the absence of preliminary relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  The deprivation of constitutional rights "unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *see Planned Parenthood of Minn., Inc. v. Citizens for Cmty. Action*, 558 F.2d 861, 867 (8th Cir. 1977) ("Planned Parenthood's showing that the ordinance interfered with the exercise of its constitutional rights and the rights of its patients supports a finding of irreparable injury.").

Plaintiffs argue that the Act will inflict serious and irreparable harm on their patients by forcing them to remain pregnant against their will (Dkt. No. 13, at 12).  Plaintiffs further argue that these harms would most substantially impact communities that already face a higher risk of death from pregnancy, including Black Arkansans, rural Arkansans, and pregnant people with the fewest means (*Id.*).  According to plaintiffs, denying people the ability to terminate a pregnancy would increase preventable deaths and inflict physical, emotional, and financial injuries upon plaintiffs' patients (*Id.*, at 13).

Defendants make no argument as to whether or not plaintiffs or plaintiffs' patients will experience irreparable harm. Instead, defendants contend that "a decision to grant a preliminary injunction would 'subject[] [the State] to ongoing irreparable harm.'" (Dkt. No. 22, at 21 (quoting *Maryland v. King*, 567 U.S. 1301, 1303 (Roberts, C.J., in chambers)).

For now, this Court finds, based on the record before the Court at this stage of the proceeding, that the Act would cause imminent irreparable harm to plaintiffs and their patients. This Court has previously noted that "the State has no interest in enforcing laws that are unconstitutional" and that, therefore, an injunction preventing the State from enforcing unconstitutional acts "does not irreparably harm the State." *Little Rock Family Planning Servs. v. Rutledge*, 397 F. Supp. 3d 1213, 1323 (E.D. Ark. 2019), *aff'd in part, remanded and vacated in part*, 984 F.3d 682 (8th Cir. 2021) (affirming this Court's order with respect to preliminary injunction of two acts which effectively prohibited a substantial universe of pre-viability abortions). Further, the harms to women who are unable to obtain abortion care as a result of the Act are irreparable. *Roe*, 410 U.S. at 153 (describing "[s]pecific and direct harm" from forced childbirth). Since the record at this stage of the proceedings indicates that women seeking abortions in Arkansas face an imminent threat to their constitutional rights, the Court concludes that they will suffer irreparable harm without injunctive relief.

### 3.     Balance Of Equities And The Public Interest

Plaintiffs argue that the balance of equities tips decidedly in their favor because their requested relief will simply preserve the *status quo* (Dkt. No. 13, at 13). Plaintiffs further argue that injunctive relief serves the public interest because the protection of constitutional rights is always in the public interest (*Id.*, at 14). Defendants assert that the Act is in the public interest

because it "addresses Arkansas's legitimate interest from the outset of the pregnancy in protecting the life of the unborn human who may be born." (Dkt. No. 22, at 21).

The Court must examine this case in the context of the relative injuries to the parties and to the public. *Dataphase*, 640 F.2d at 114. The Eighth Circuit has stated that "whether the grant of a preliminary injunction furthers the public interest . . . is largely dependent on the likelihood of success on the merits because the protection of constitutional rights is always in the public interest." *Rounds*, 530 F.3d at 752. After balancing the relative injuries and the equities, in the light of the limited record before it, the Court concludes that the Act would result in greater irreparable harm to plaintiffs and their patients than to the State. At this stage of the proceeding, the Court finds that the threat of irreparable harm to plaintiffs, and the public interest, outweighs the immediate interests and potential injuries to defendants.

## IV.    Conclusion

For the foregoing reasons, the Court determines that plaintiffs have met their initial burden for the issuance of a preliminary injunction. Therefore, the Court grants plaintiffs' motion for a temporary restraining order and/or preliminary injunction to the extent that the motion seeks a preliminary injunction (Dkt. No. 12). The Court hereby orders that defendants, and all those acting in concert with them, including their employees, agents, and successors in office, are enjoined from enforcing Act 309 of 2021 with respect to pre-viability abortions. Further, defendants are enjoined from failing to notify immediately all state officials responsible for enforcing the requirements of Act 309 of 2021 about the existence and requirements of this preliminary injunction. This preliminary injunction remains in effect until further order from this Court.

The Court enters this Order on Tuesday, July 20, 2021, at 5:00 p.m.

_____
Kristine G. Baker
United States District Judge